BOTTOMS BAPTIST ORPHANAGE *v.* JOHNSON

5-3609                                   398 S. W. 2d 544

Opinion delivered January 31, 1966

*Barber, Henry, Thurman, McCaskill & Amsler,* for appellant.

*Paul K. Roberts,* for appellee.

W. S. MITCHELL, Special Chief Justice. This Workmen's Compensation Claim involves the construction of Ark. Stats. 1947 Sec. 81-1313c dealing with claims for hernia.

Appellee contends that she suffered two accidental injuries, one on Sunday, September 4, 1960, and a second shortly before Thanksgiving of the same year, both arising out of the course of her employment and resulting in a condition diagnosed as cystocele and second degree prolapse of uterus. She was given two weeks' leave of absence by her employer in September, 1960 but did continue working until January 15, 1961, followed by

an operation on February 28, 1961, returning to work on April 15, 1961.

Appellants denied that there was any accidental injury arising out of Appellee's employment and contended that she had failed to sustain the burden of proof required of hernia claimants.

Medical testimony described uterine prolapse as a form of hernia. The Referee found that Appellee's condition was not work-connected and denied the claim, which denial was affirmed by the Full Commission, whose conclusions read:

## "CONCLUSIONS

Although there is some doubt that the claimant sustained a hernia which arose out of and in the course of her employment for the respondent it is clear that she failed to cease work immediately as the result of such condition. The record also reflects that physical distress following the occurrence of the alleged hernia was not such as to require the attendance of a licensed physician within 48 hours. It also appears that there was not severe pain in the hernia region. These and other requirements must be met under provisions of Section 13 (e) of the Arkansas Workmen's Compensation Act before a claimant can recover. The claimant failed to meet these requirements.

The Referee's decision is, therefore, affirmed, and the claim is denied."

Appellee in her notice of appeal both to the Full Commission from the Referee's Opinion and later to the Circuit Court from the opinion of the Full Commission preserved for argument charges of error (1) in the conclusion that her condition was not work-connected; (2) in the holding that she had not complied with the provisions of the hernia statute and (3) in classifying

a prolapse of the uterus as a hernia within the meeting of the Workmen's Compensation Act, Section 81-1313e.

The Circuit Court sustained Appellee on all points and reversed the Commission. In the briefs the same issues are presented to this Court.

Was Appellee's condition work-connected?

On June 9, 1960 Appellee was employed as a dietitian by Appellant, Bottoms Baptist Orphanage. The Orphanage had three large walk-in refrigerators, the door to the middle section, which was the freezing unit, being harder to open and close than the other doors.

Appellee testified that on the morning of Sunday, Sunday, September 4, 1960, she had entered the freezing unit to check out food for the kitchen and when finished she tried to shut this refrigerator door but had difficulty in doing so.

She put both of her hands about head high against the door and pushed forward to close it, putting her whole weight against it to slam it or push it closed, but the door would bounce back. She weighed about 115 pounds. She had pushed in this manner about three times when on the fourth time as she pushed forward on the door she felt a sensation of pressure and a loss of water in the pelvis. She felt like she was just divided. She had no pain, nothing more than that pressure. It was like she was giving birth to a child. Some might call it pain but she called it pressure.

Prior to this occurrence she had experienced no trouble of this sort.

One of the colored cooks helped Mrs. Johnson to close the door after the time when she had this sensation in the pelvic area.

She told the other employees that it seemed like

when she closed the door it was going to pull her in two. She continued working and did not visit a doctor until September 10, 1960, when she saw her family physician, Dr. W. D. Robertson, who told her that she had a prolapsed uterus and that the only cure was surgery.

Brother Seafelt, Manager of the Orphanage, suggested that she take time off, which she did, and then Dr. Robertson had her take another week off, for a total of about two weeks off in September. Dr. Robertson prescribed some exercises.

She improved as the result of this rest and felt fine and went back to work.

On Tuesday before Thanksgiving there was some orange juice in a case that was sitting on the floor with ice around it and she attempted to pick up the crate, when she experienced pain in the the same area where she had noticed it before and things never went back in place any more nor did the pressure leave until she had her operation. She continued to work, however, until the latter part of January, 1961.

Clara Moore, the cook, testified that she was on the job and remembers the door-closing incident, shortly after which—within 30 minutes—Appellee said that she had a pain in her lower stomach and indicated where the pain was. Appellee continued to work but complained about the lower part of her stomach, saying that it pained her.

Another employee of the Orphanage, Raymond Best, stated that the door had been giving trouble in closing for approximately six months before Mrs. Johnson complained of being injured. He knew about Mrs. Johnson's injury. The door was not a perfect fit on the box, therefore moisture would enter around the door and cause it to stick or freeze, which would make it difficult to open the door. At times he would have to use

a crowbar to pry it open and had done so several times before the door closing incident.

Dr. Robertson wrote the Workmen's Compensation Commission under date of January 18, 1961, as follows:

"This is the first case of this nature in which there was a question of compensability that I have handled. Since I am not familiar with the Commission's views in this area your opinion would and is needed before I can properly advise the above patient.

"Mrs. Johnson first visited me complaining of a feeling of pressure in the pelvic area on September 10, 1960. She dated the onset of symptoms to roughly one week previous, first noticing a feeling of discomfort when she opened the heavy doors to the walk-in refrigerator at the Bottoms Baptist Orphanage in Monticello, Arkansas.

"Mrs. Johnson is 50 years of age. She has had five pregnancies and has delivered four full-term infants; one miscarriage.

"It is a well-known fact that childbearing is the incident in most cases of pelvic relaxation resulting in uterine prolapse; however it is also true that most people who sustain a rupture while working have a pre-existing weakness.

"In my mind there is a similarity in the above diseases. I would certainly appreciate your views on this case. Mrs. Johnson was advised that I would write this letter before I would attempt to advise her on whether or not it was a compensable condition."

On January 30, 1961, following correspondence from the Commission, the Doctor wrote again, giving additional information and stating:

"Mrs. Johnson's disease, pelvic relaxation with uterine prolapse, has been aggravated by heavy lifting she says she has done in her capacity as kitchen employee at the Orphanage. I have seen this lady several times for different complaints since July of 1959 and never before her visit of September 10, 1960 did she complain of anything pointing to uterine prolapse."

In addition to Dr. Robertson's testimony, Appellee introduced a statement from Dr. Merl Crow, who had performed the operation on Appellee, and also presented testimony of Dr. Joe Sanderlin, a specialist in gynecology. Dr. James Barker, also a gynecology specialist, testified for Appellant.

The doctors were in agreement as to the nature and usual development of the condition known as "pelvic relaxation with uterine prolapse," to understand which a definition and description of terms is required, and is found in Schmidt: *Attorney's Dictionary of Medicine, Illustrated*:

"*Uterus.* The womb or organ in which the child is nourished and carried from its inception as a fertilized female egg cell through the stages of embryo and fetus until it is delivered to the outside world. It is a roughly pear-shaped body about three inches long situated in the lower part of the abdomen (technically in the pelvis) with its thin end down. The main rounded portion is the body; the tapering narrow end is the neck or cervix. The neck of the uterus is continuous with the vagina and protrudes partly into the canal of the vagina like a pear placed with the narrow end down into a small vase.

. . . The uterus is held in place by several ligaments and in its normal position is tilted forward resting upon the bladder." (Page 856)

"*The Vagina.* The female canal extends from the

uterus on the inside to the opening on the outside . . . just below the outlet of the bladder." (Page 858)

"*Prolapse.* A falling or slipping down of an organ or other structure as of the uterus, rectum, etc." (Page 646)

"*Cystocele.* A type of hernia in which the bladder forms a protrusion in the vagina. The vagina may ......here be regarded as the outlet of the uterus occupying an intermediate position, (in the lower end of the female trunk) between the rectum and the back and the urethra (the outlet of the bladder) in front. The bladder is normally above the vagina and in front of it since it is in front of the uterus. When the tissues in the lower end of the trunk become relaxed, the bladder slips down and forms a bulge in the wall of the vagina." (Page 209)

The uterus is supported almost entirely by two cardinal ligaments which are inserted into the upper cervical portion of the uterus, acting as two arms of a sling. When these and other ligaments which form the pelvic floor become relaxed, the uterus slides down the vaginal canal below the level of its normal support. There are three degrees of prolapse, each degree indicating the anatomical point in the vagina to which the uterus descended.

In prolapse, the uterus with no change in size, follows substantially the same downward motion and path as it does in pregnancy, without the resiliency in the ligaments to restore it to the normal position.

"The uterus is developed in an extraordinary way during pregnancy . . . Before pregnancy the cavity of the uterus is about 2½ inches long, but at the end of pregnancy it is about a foot long; its weight increases from one ounce to two pounds. During the early months of pregnancy the uterus descends

into the pelvic cavity but after the third month it rises until near the end of pregnancy when it sinks downward again." Maloy: *Legal Anatomy and Surgery* 2d Edit., page 749.

The medical witnesses agreed that relaxation of the pelvic floor tissues usually stems from multiple childbirths, resulting in stretching and tearing of the tissue, coupled with a later loss of hormones after the menopause, creating a tissue insufficiency, the net result being that the ligaments lose their strength, elasticity and resiliency. These muscular changes take place gradually over many years.

Recognizing the existence of this relaxed condition, it was Dr. Sanderlin's opinion that when Appelee put her hands on the refrigerator door and slammed it, this action created a strain internally by lowering the diaphragm, thus decreasing the intraabdominal capacity which increased the pressure within the abdominal and pelvic area exerted against the line of least resistance which in her case was a weakened pelvic floor. This strain aggravated the pre-existing weakened muscular condition, in Dr. Sanderlin's opinion, and caused the prolapse to occur when it did. Dr. Robertson and Dr. Crow concur that the strain could have precipitated the prolapse.

On the other hand, Dr. Barker was of the firm opinion that Appellee's condition was not related to her work. As to any strain caused by closing the door or attempting to raise the container of orange juice and its effect on the prolapse of the uterus, the Doctor said:

"In my opinion it could have been a precipitating or aggravating factor . . . but not a definite contributory and certainly not causative . . . There is a remote possibility but it isn't in my mind any more precipitating or aggravating factor than walking up stairs."

Appellee testified that she had no symptoms prior to the door closing incident. Her fellow employee corroborated Appellee's testimony as to the onset of her trouble being in close proximity to the door closing incident followed by considerable discomfort. Dr. Robertson is positive that Appellee first saw him about six days after the incident. He was sufficiently convinced of the merits of her case to take it upon himself to write the Workmen's Compensation Commission in her behalf.

The testimony on this phase of the case preponderates in favor of Appellee and the Commission in effect so found by its statement in the Conclusion to its Opinion in which it relied in affirming the Referee's denial of the claim on the failure of the Appellee to meet the requirements of the hernia statute. Appellee's exertion in closing the refrigerator door, under this record, was a contributing cause of the uterine prolapse. *Bryant Stave and Heading Company* v. *White,* 227 Ark. 147, 296 S. W. 2d 436; *The Crossett Co.* v. *Childers,* 234 Ark. 320, 351 S. W. 2d 841.

This holding that the occurrence of a prolapse of the uterus can be work-connected finds support in *Berkhamer* v. *Heinsling et al.,* Pa. Super. 28 Atl. 2d 807 (1942), where the claimant slipped and fell in the course of her employment in the starch room of a laundry where she had worked continuously for more than thirty years, fracturing the lower end of her right femur, and sustaining a prolapse of the uterus, which latter condition was not noticed until after an extensive period of convalescence.

Also, in the case of *Burek* v. *Domur Realty Corp.,* 181 N. Y. S. 2d 45, the claimant testified that she was a janitress for about six years and for three years her work included lifting or moving heavy cans of ashes. On a certain day while lifting such a can, it slipped out of her hands:

"The whole thing dropped and meantime I felt sore inside . . . later on I felt everything drop."

At the conclusion of the testimony, and because of the divergent medical views, the New York Commission selected an independent gynecologist, who found that the relaxed condition of the pelvic floor in this case was actually an occupational disease, resulting from several years of repeated and continuous lifting, inducing the disabling physical result.

The Commission adopted this view, which was accepted by the Court, whose opinion said that the facts would have warranted a finding that the prolapse of the uterus was causally related to the specific incident of the "ash can."

Does Appellee's proof meet the five requirements of Sec. 81-1313c?

This section reads:

"*Hernia*: In all cases of claims for hernia, it shall be shown to the satisfaction of the Commission:

(1) That the occurrence of the hernia immediately followed as a result of sudden effort, severe strain or application of force directly to the abdominal wall;

(2) That there was severe pain in the hernial region;

(3) That such pain caused the employee to cease work immediately;

(4) That notice of the occurrence was given to the employer within 48 hours thereafter;

(5) That the physical distress following the occurrence of the hernia was such as to require the attendance of a licensed physician within 48 hours after such occurrence."

The record fully sustains the Commission's rulings that Appellee did not suffer severe pain and that the pain did not cause her to cease work immediately. It would be redundant to discuss further the testimony on the latter point. As to the sensation she experienced Appellee testified on direct examination:

"Q. Mrs. Johnson, describe the sensation you had or the pain you had or what reaction you had when you attempted to shut this door and knew something was wrong."

"A. Well, it was just like something had dropped out of place and there was a pressure and it wasn't as bad right then as it got to be by the ligaments being torn aloose and standing on my feet, it made it worse than it did that day."

On cross examination she stated:

"Q. Would you describe that sensation or feeling for us, please?

"A. Well, it was just a pressure and loss of water and that was about as well as I can describe it.

"Q. Can you describe for us where the pressure was, please ma'am?

"A. Well, it was in the pelvis or just above. Well, in other words it seemed like I was just dividing right in here.

"Q. Now, by that I interpret your feeling of pressure in the lower part of your abdomen?

"A. Yes, sir."

. . . . . . . . . .

"Q. Did you have any pain in any part of your body at that time?

"A. No, no pain, nothing more than just pressure.

"Q. You describe it as 'pressure' feeling and not a feeling of pain?

"A. Well, it is what I would call it. In other words, like you were going to give birth to a child."

. . . . . . . . . .

"Q. Did you suffer a sharp pain when you picked up the orange crate?

"A. Well, not too sharp, but it was pain."

Appellee further testified that some might call these sensations pain but she described them more as pressure.

Appellee's proof fails to meet two of the requirements of Sec. 81-1313e, and since failure to discharge the burden of proof as to any one of the five requirements would bar recovery under this section of the statute, it is unnecessary to discuss the arguments under the other subsections. *McMurtry* v. *Marshall Model Market No.* 48, 237 Ark. 11, 371 S. W. 2d 4.

We now reach the most difficult question for decision.

Is Appellee's condition, described as "second degree prolapse of the uterus and cystocele" a hernia within the meaning of the phrase "Hernia: In all cases of claim for hernia . . . " in Sec. 81-1313e?

The Circuit Court held as a matter of law that Appellee's condition was not a hernia within the meaning of Sec. 81-1313e and therefore should be treated under

the Workmen's Compensation Act as a general acciden-
tal injury.

Webster: New International Dictionary, 2d Edition,
defines hernia and rupture:

> "Hernia: A protrusion consisting of an organ or a
> part projecting through some natural or accidental
> opening in the walls of its natural cavity, as hernia
> of the brain or of the bowels. Hernia of the abdom-
> inal viscera is the most common. Called also rup-
> ture."

> "Rupture: 1. A breaking apart, or separating, or
> state of being broken apart; as the rupture of the
> skin, of a blood vessel; . . . . (3) med. hernia."

In Workmen's Compensation Statutes the word
"hernia" is used by the Legislature in a popular and
therefore more limited sense. Although an interverte-
bral disk is sometimes referred to as a "hernia nucleus
propulsus" it is not a "hernia" within the meaning of
that term nor is a brain hernia. Provisions of such stat-
utes cannot be made to apply practically to such injuries.
*Royal Indemnity Company* v. *Jones,* Tex. Crt. Civ.
App. 201 S. W. 2d 129. There, the word "hernia" gen-
erally means an abdominal hernia or rupture, 99 C.J.S.,
§ 185, page 637, Workmen's Compensation Section 165,
described in the following definition:

> "A hernia is a protrusion of any organ through an
> abnormal opening in the wall of the containing cav-
> ity. When the word "hernia" or "rupture" is used
> without qualification it is intended to mean a pro-
> trusion from the abdomen usually of the intestine
> through an abnormal opening in the abdominal
> wall." Gray: Attorneys' Textbook of Medicine, 3rd
> Edition, Vol 3. Sec. 65.02.

That the Arkansas Legislature intended to localize
the word "hernia" as used in Sec. 81-1313e to those

which protrude through the abdominal wall is evident:

"*Hernia*: In all cases of claims for hernia, it shall be shown to the satisfaction of the Commission:

(1) That the occurrence of the hernia immediately followed as a result of sudden effort, severe strain, or the application of force directly to the abdominal wall; . . . "

In Texas where a comparable statute does not refer to the abdomen, the Court not only restricts the word "hernia" to abdominal hernias, but has said:

"Under that section the term is used in its popular sense and usually refers to the inguinal type. *Lewis* v. *American Surety Company*, 143 Texas 286, 184 S. W. 2d 137. The inguinal type is one that is readily diagnosed and usually corrected by comparatively simple operation. That is the reason for this sort of operation being especially treated by the Legislature." *Texas Employer's Insurance Association* v. *Shelton*, 161 Texas 259, 339 S. W. 2d 519.

According to *Gray, supra,* Section 65.04 characteristic names are given to hernias indicative of that part of the abdominal wall through which the hernia passes and he lists: diaphragmatic hernia, passing through the diaphragm; umbilical hernia, passing through abdominal wall near umbilicus or navel; femoral hernia, passing through femoral canal, which carries femoral artery to the front of the leg; inguinal hernia, passing through inguinal canal, which carries the structures from the testicles to the abdomen; ventral hernia, passing through the front of the abdomen at points not mentioned above; and lumbar hernia, passing through back of abdomen in region of small of the back.

As to the most common hernias, this comment is pertinent:

"In inguinal, femoral and umbilical hernias, there is a weak place in the belly wall. The weak parts to be considered in inguinal and femoral hernias are the external and internal abdominal rings and the canal. These rings do not really exist except when a hernia is pushing through them; and the canal is a mere slit or flat passage." Maloy: Legal Anatomy and Surgery, 2d Edition, page 616.

It is of passing interest to note that only claims involving inguinal and umbilical hernias have reached this court; direct inguinal hernias (as being caused by a blow from the outside), *Jobe* v. *Capital Products Corp.*, 230 Ark. 2, 320 S. W. 2d 634; indirect inguinal hernias (indicating a congenital weakness aggravated by a sudden strain resulting in the hernia), *Harding Glass Company* v. *Davis*, 212 Ark. 89, 204 S. W. 2d 880, *The Crossett Co.* v. *Childers*, 234 Ark. 320, 351 S. W. 2d 841, *Prince Poultry Company* v. *Stevens*, 235 Ark. 1034, 363 S. W. 2d 929, *McMurtry* v. *Marshall Model Market No. 48*, 237 Ark. 11, 371 S. W. 2d 4; and umbilical hernias, *Williams Manufacturing Co.* v. *Walker*, 206 Ark. 392, 175 S. W. 2d 380.

For the purpose of determining the applicability of special hernia statutes such as ours some courts have declined to make a distinction between hernias which manifest their presence by protrusion through some part of the abdominal wall saying that all such are subject thereto. *Kinsman* v. *R. F. Post Company*, 152 Pa. Sup. Court 67, 81 Atl. 2d 358 (femoral hernia): *Commans* v. *Ingalls Shipbuilding Corp et al (Mississippi)* 128 So. 2d 115 (diaphragmatic hernia) this reasoning being opposed to the view expressed by the Texas Court in the above cited cases. For the purposes of this opinion it is neither necessary nor desirable to distinguish, or indicate whether a distinction should be made, between hernias generally referred to as abdominal hernias involving a protrusion through an abnormal opening of the abdominal wall.

This Court has recognized the Legislative motive behind the requirements of Sec. 81-1313e:

"Special hernia statutes such as ours, it has been said, are intended to distinguish non-industrial congenital hernias from those definitely produced by trauma or effort at work. Larson, Workmen's Compensation Section 39.70." *Crossett Co.* v. *Childera, supra.*

Justification for these requirements comes primarily from the field of medicine:

"How will an Industrial Accident Board or a Jury determine that a hernia is entirely produced by injury? Medically it must be agreed that if abdominal contents immediately pass through an opening in the abdominal wall where there was no preexisting opening, that the muscles forming the wall must have been immediately torn asunder. Such cannot occur without immediate excruciating pain and the appearance of a lump at once. Further, with the abdominal contents immediately herniating, the organs involved will stretch their attachments. The intestine is the usual organ which herniates and the sudden stretching of its attachment almost invariably produces nausea or vomiting. Therefore it is usually considered that a hernia probably was accidental, particularly if the injury was very severe, if there was a definite history of immediate excruciating pain with nausea or vomiting and the immediate appearance of a lump which is determined to be a hernia. Obviously the symptoms must be severe enough that the patient becomes disabled at once." *Gray supra,* Section 65.16.

This Court has, in effect, given credence to this reasoning in holding that a congenital predisposition to hernia does not become a statutory hernia under Sec. 81-1313e until there is a "break through." *Crossett Co.* v. *Childers, supra,* where it was said:

"Childers testified that on February 9 while he was at work a heavy wrench came in contact with his stomach as he was attempting to free certain jack screws. The pain was intense but it went away after he had rested for five or ten minutes and he was able to finish the day's work. That night he observed a small lump in the hernial area but it did not occur to him that he might have a hernia. He did his usual work during the next two days, though with some discomfort.

On February 12 there was a leakage of chlorine gas at the plant. Childers had trouble breathing and coughed steadily for 20 minutes or more. This coughing caused abdominal pain that Childers described as much more severe than that upon the first occasion. In the hernia region '(it) felt like it just broke on through. A big swelling come out.' Childers was forced to cease working and was sent to a doctor, who found that he had an inguinal hernia."

The Commission's conclusion, that it was not until February 12 that Childers' condition actually became one of hernia, was affirmed:

"There can be no doubt that it was Childers' work and working condition that caused his congenital weakness to be converted into an actual case of hernia. Under the Appellant's theory Childers' injury could never have been compensable for the incident of February 9 did not cause him to cease work as the statute demands and by February 12 it was too late for him to require the attendance of a physician within the limit of 48 hours. It may be true, as the Appellant insists, that the onset of hernia may in some cases be too gradual for it to meet the statutory conditions for compensability. In this record, however, there is substantial evidence to support the Commission's conclusion that it was not until February 12 that Childers' condition ac-

tually became one of hernia. In that view all of the statutory requirements are shown to have existed.''

Under all Workmen's Compensation Statutes liability for the payment of compensation is premised on there being an accident in the course of the employment and an injury resulting therefrom. The Supreme Court of Georgia has observed that the breakthrough of the abdominal wall actually constitutes the accidental injury, the hernia or droppage of the intentines being the natural result of this injury.

''The rule under our Workmen's Compensation law as to hernia is somewhat different from that applyto other injuries in that not only must hernia have resulted from injury by accident arising out of and in the course of the employee's employment but it must be definitely proved to the satisfaction of the industrial board that such resulting hernia 'did not exist prior to the accident' and 'was accompanied by pain' and 'appeared suddenly' and 'immediately followed (the) accident.' '' *Liberty Mutual Insurance Company* v. *Blackshear,* 197 Ga. 334, 28 S. E. 2d 860.

''However, although it has been held by this Court in *Hardware Mutual Casualty Company* v. *Sprayberry,* 195 Ga. 393, 24 S. E. 2d 315 and by the Court of Appeals in the same entitled case (69 Ga. Appeal 196, 25 S. E. 2d 74) that the term ''hernia'' as used in the statute means the protrusion of an internal organ or part projecting through an openin the walls of the abdominal cavity, we think that the rupture of the tissues of the abdominal wall arising out of an injury in the course of the employment constitutes the actual accidental injury, and that the hernia is merely a natural resultant therefrom; and that the sudden appearance of the rupture, as manifested by accompanying evidences of pain, immediately and without substantial inter-

val following the accident, constitutes an integral part of the resulting hernia within the meaning of the statute; although under the Sprayberry decision the statute would not have application unless the rupture was actually followed naturally in due course and without interruption by a resulting protrusion.''

Bearing in mind these decisions and that a ''hernia'' as that word is used in Sec. 81-1313e is a protrusion of an organ from the abdominal cavity through an abnormal opening in the abdominal wall, was Appellee's condition such a hernia, or should it be treated as a general injury?

Dr. Robertson described the condition as ''second degree prolapse of the uterus with cystocele'' and Dr. Barker in answer to the question as to whether or not he had told Mrs. Johnson that she had sustained some kind of a hernia replied.

> ''A. I explained it to her in terms of she had had a marked droppage of the bladder, which is in our terminology the sacropubic hernia which is an all-encompassing word which means droppage or herniation of her entire pelvic organs, including her bladder, uterus, rectum.''

Dr. Sanderlin referred to it as a ''pelvic hernia.''

It is apparent that in using the word ''hernia'' the medical witnesses in the instant case had in mind the medical or surgical definition and not the definition appropriate to Workmen's Compensation Statutes.

Dr. Robertson testified:

> ''Q. What is a hernia?
>
> ''A. A hernia is a weakening in one of the layers

of the body causing a protrusion or bulging of underlying or deeper structures.''

When asked to define the word ''hernia'' Dr. Sanderlin replied:

''Hernia is a displacement of certain organs from normal position through a weakened area in the walls containing them.''

The definition of the word ''prolapse'' does not embody any element of rupture. Prolapse of the uterus is the falling or slipping down of the uterus from within the abdominal cavity further than normal into the tube-like vagina. The upper end of the vagina is an opening of the abdominal cavity, the cervix of the uterus normally resting in this opening.

According to Dr. Sanderlin the internal pressure built up by Appellee's exertion was not against the abdominal wall but against the pelvic floor weakened by disease caused by injuries due to multiple births and hormone deficiencies. This is not a congenital condition. In this doctor's opinion the weakened supporting ligaments had allowed the body of the uterus to elevate and become a prolongation of the vagina thus being in a position of potential prolapse.

Appellee's testimony establishes that the droppage, contributed to by the exertion, was not accompanied by great pain. Dr. Sanderlin explained that there was no tearing of tissues such as is experienced when either a break occurs in the abdominal wall or when the intestines tear loose as they fall through such a break. The doctor did not believe that sudden, as distinguished from gradual, droppage of the uterus would normally produce severe pain.

Once a prolapse occurs an operation is inevitable, according to Dr. Barker.

"A. I would first recommend what you'd do to get it cured, because sooner or later she's going to be back. I never have to talk these women into having surgery. They are the easiest ones to take care of because when I see it it is just a case of whether I do it this month or a year from now and they will be back for sure."

The operation performed on Mrs. Johnson was a total abdominal hysterectomy, bi-lateral salpingo-ocpherectomy and anterior and posterior colporrhaphy and porineorrhaphy, which means that the entire uterus and both ovaries were removed by abdominal incision with repair of the pelvic floor. Is this an operation contemplated by the statute which requires the employer to pay for a radical operation for the repair of a hernia? Certainly not in the popular sense.

It is noted that medical and legal texts do not treat uterine prolapse under the general heading of hernias. In 5 Schneider Workmen's Compensation Text Permanent Edition, Section 1461 Uterus Prolapse appears under the general heading of "Diseases as Accidents" at page 570. Section 1470 is headed "Hernia-General" and the heading Hernia appears on every page from 573 through page 614.

Because of the physical differences between a hernia and a prolapse of the uterus and under the testimony in this case an accidental injury contributing to the condition described as second degree prolapse of the uterus with cystocele (bulging into the side of the vagina by the bladder permitted by the weakened pelvic floor) which normally occur together would not be compensable if such condition is construed to be a hernia as that word is used in Sec. 81-1313c.

We do not attribute any such intention to the Legislature.

On the contrary, we deem it appropriate to recognize the merit of the following principle:

"It is the settled rule in this state in aid of interpretation that the Compensation Act grounded as it is in social and economic considerations is to be liberally construed to effectuate the general legislative policy (citing cases). The special provision relating to herniae is in the nature of an exception and by the same token is to be strictly construed. A case not within its precise letter is to be excluded." *Furferi* v. *Pennsylvania R. Co.* 117 N. J. L. 508, 189 Atl. 126, 130.

This case is remanded to the Workmen's Compensation Commission with instructions to make an award to Appellee for a general injury.

HARRIS, C. J. not participating.

COBB, J., concurs.

OSRO COBB, Justice, concurring. I fully agree that the Workmen's Compensation Commission failed to follow our statutory law and the yardsticks provided by decisions of this court in holding against appellee, the injured employee. I, therefore, concur with the action of this court in remanding the case to the Workmen's Compensation Commission with instructions to make an award to appellee.

My primary reason for writing this short concurring opinion is to take note that the original injury to appellee occurred in 1960. Now, some five years later, the case has finally reached this court and even now we are limited in the relief we can provide appellant to a remand of the case with instructions to the Commission. The long and inordinate delays incident to the adjudication of this case are shocking indeed. Justice delayed is frequently justice denied. This is dramatically evident in cases of this character.

I therefore suggest the compelling importance of adjudicating controverted compensation claims with maximum expedition at all levels of consideration of such cases. Of course, this expeditious handling of such cases should be done without sacrifice or compromise to any of the valid rights of the parties litigant.